IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Orlando Smith, #267982, )<br><br>                         Petitioner, )<br><br>         vs. )<br><br>Warden of Broad River )<br>Correctional Institution, )<br><br>                         Respondent. )<br>_____) | Civil Action No. 6:07-0327-RBH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

**BACKGROUND OF THE CASE**

The record reveals that the petitioner is currently confined in the Broad River Correctional Institution of the South Carolina Department of Corrections (SCDC), pursuant to commitment orders from the Greenville County Clerk of Court. The Greenville County Grand Jury indicted the petitioner at the October 2001 term of court for murder (98-GS-23-5212). Attorney C. Timothy Sullivan represented him on these charges. On July 17-19, 2000, the petitioner received a jury trial before the Honorable Larry R. Patterson, and he was found guilty as charged. Judge Patterson sentenced him to 30 years imprisonment.

The petitioner timely served and filed a notice of appeal. Appellate Defender Joseph Savitz represented him on appeal to the South Carolina Court of Appeals. On November 8, 2001, Mr. Savitz filed a Final *Anders* Brief of Appellant[1] on the petitioner's behalf and petitioned to be relieved as counsel. There was only one issue presented in the brief:

> The judge erred by refusing to direct a verdict acquitting appellant of murder.

The petitioner filed a *pro se* "Initial *Anders* Brief" on December 31, 2001. His *pro se* "Brief" actually consisted of motions for the Court of Appeals to (a) "compel production of complete audio cassette record of trial based upon appellant's assertion the transcript as furnished is not accurate; and (b) for an order to stay proceeding[s] pending production of requested evidence; and (c) for order staying timely Rule germane to filing of Pro Se meritorious brief of appellant and for (d) enlargement of time in sum of ninety (90) days pending efforts of our family to retain private counsel in this case." Assistant Deputy Attorney General Donald J. Zelenka represented the State on appeal.

On May 23, 2002, in an unpublished opinion, the South Carolina Court of Appeals dismissed the petitioner's appeal and granted counsel's request to be relieved. *State v. Orlando F. Smith*, 02-UP-372 (S.C. Ct.App. filed May 23, 2002). The South Carolina Court of Appeals sent the remittitur to the Greenville County Clerk of Court on June 25, 2002.

The petitioner filed a *pro se* post-conviction relief (PCR) application (02-CP-23-6327) on September 17, 2002. He alleged the following grounds for relief in his application (verbatim):

> (1)     Counsel. Pre-trial, failed to conduct proper and thorough investigation of the material facts of this case, thereby,

---

[1] *See Anders v. California*, 386 U.S. 738 (1967).

2

rendering the final decision a most prejudicial one in view of the facts of this case.

(2)    Failure to properly raise objection to Judge Larry R. Patterson's refusal to direct a verdict acquitting appellant of murder resulted in applicant becomming procedurally barred to raise claim as his first right on direct appeal, which results in ineffective assistance of trial counsel and establishes a grave prejudice to applicant therefrom.

(3)    Counsels failure to subpeona certain of applicants witnesses resulted in eneffective assistance of trial counsel and results in prejudice to this applicant.

(4)    That the combined - errors contributed by trial counsel led to a situation where the culmulative effect doctrine as to this instant case, is triggered due to the resulting prejudice it created to this applicant.

(5)    Trial counsels failure to object to certain of the states trial evidence which had been inadmissible results in ineffective assistance of trial counsel in a case where the state prevailed in a matter which rests purely upon the factor of supposition however patently lacking in evidence. (Note; this is a case in which the court failed to view the evidence impartially and HAD the lower court to have made such as assessment, ..., it must direct a verdict of acquittal if there is no direct or substantial circumstantial evidence reasonable tending to prove the guilt of the accused if in which his guilt might be fairly and logically deduced. In the present case, the only 'evidence' ... merely raised the suspicion of the accused and was not sufficient to survive a directed verdict. ...

(6)    But for the errors and ommission of trial counsel, the result would have been favorable to this applcant.

(7)    But for counsels errors and omissions, applicant would not presently stand unconstitutionally convicted of a crime applicant did not commit.

(8)    Counsel may not articulate valid reasons for the plethora of ommissions and ineffective assistance afforded this applicant during jury trial of the case ...

(9)    Counsel spent inadequate time in pre-trial (a) conference with this applicant, (b) in pre-trial investigation activity and was not (c) prepared for trial in this case.

3

(10)    Counsels ineffectiveness was so pervasive, the applicant may be exempt from proving actual prejudice ...

(11)    Counsels failure to motion, pre-trial for a psychological exam in view that applicant informed counsel that he was at the periods both (a) on probation and (b) under the influence of drugs constitutes ineffective assistance of counsel, among other things., each being germane to this case and cobined, does trigger doctrine of cumulative error, particularly where, as in the instant case, applicant is not guilty of having committed any crime whatsoever and was falsely accused and convicted due to ineffective counsel.

The State filed its return on May 2, 2003.

The Honorable Edward W. Miller held an evidentiary hearing into the matter on October 22, 2003, at the Greenville County Courthouse.  The petitioner was present at the hearing and represented by attorney John A. O'Leary represented him.  Assistant Attorney General Christopher L. Newton represented the State.  The petitioner testified on his own behalf and presented the testimony of Carolyn Bell.  The State presented the testimony of trial counsel, Mr. Sullivan.

By order of March 31, 2004, Judge Miller denied and dismissed the application.  The order of dismissal addressed the merits of his claims that trial counsel was ineffective because he failed to (1) object to the letter being provided the morning of the trial; (2) ask the judge to enforce his subpoena; (3) call witnesses and hire an investigator; (4) test hair samples or challenge the palm print; and (5) object to photographs that were introduced by the State.  A timely notice of appeal was served and filed.

Assistant Appellate Defender Robert M. Pachak represented the petitioner in collateral appellate proceedings.  On August 9, 2004, Mr. Pachak filed a *Johnson*[2] petition

---

[2]*Johnson v. State*, 364 S.E.2d 201 (S.C. 1988).  *Johnson* sets forth the procedures for counsel to follow when filing meritless appeals in state PCR cases pursuant to *Anders*. *Contra  Pennsylvania v. Finley*, 481 U.S. 551 (1987) (prisoner, who had no equal protection or due process right to appointed counsel in post-conviction proceedings, also had no right to insist on *Anders* procedures for withdrawal of appointed counsel when collateral counsel determined direct appeal was frivolous).

4

for writ of certiorari and a petition to be relieved as counsel. The only question presented in the *Johnson* petition was stated as follows:

> Whether defense counsel was ineffective in failing to object to that portion of the solicitor's closing argument that vouched for a witness's credibility.

The State filed a letter in lieu of return to the petition for writ of certiorari on August 11, 2004. On May 16, 2005, the petitioner submitted "PETITIONER'S PRO SE BRIEF." His brief addressed the following issues:

> (1)    Did the PCR court err in failing to find counsel ineffective for failing to subpoena witnesses?
>
> (2)    Did the PCR court err in failing to find counsel ineffective for failing to conduct adequate pretrial investigations?
>
> (3)    Did the PCR court err in failing to find counsel ineffective for failing to object to the prosecution's *Brady* violation?
>
> (4)    Did the PCR court err in failing to find counsel ineffective in failing to obtain a crime scene expert to conduct an independent examination of the evidence and crime scene?
>
> (5)    Did the PCR court err in failing to find counsel ineffective in failing to object to the trial court's failure to charge mere presence?
>
> (6)    Did the PCR court err in failing to find counsel ineffective in failing to object to the chain of custody?

The South Carolina Court of Appeals filed an order on June 12, 2006, in which it denied certiorari and granted counsel's request to withdraw. The petitioner sent an untimely petition for rehearing to the South Carolina Court of Appeals on June 26, 2006, which returned the petition for rehearing to the petitioner on July 5, 2006. The court sent the remittitur to the Greenville County Clerk of Court on July 5, 2006.

In his petition now before the court, the petitioner raises the following allegations (verbatim):

> **GROUND ONE:** Did trial court error in failing to grant direct verdict motion?

5

**SUPPORTING FACTS:** Appellate counsel did not file Notice of Appeal in a timely manner and no Petition for Writ of Certiorari was had upon this ground.

**GROUND TWO**: Was counsel ineffective in failing to subpoena potential witnesses.

**SUPPORTING FACTS**: At the PCR hearing, Petitioner secured the testimony of Carolyn Bell and presented Affidavits from several witnesses who could have testified at trial as to critical facts and evidence that would have made a major difference in the outcome of the trial. ... These facts were well presented at the PCR hearing and counsel should have been found ineffective, but was not found to be by the judge. ...

**GROUND THREE**: Was counsel ineffective in failing to conduct adequate pretrial investigations?

**SUPPORTING FACTS**: The testimony of counsel reveals that counsel made no efforts at all to seek funds to hire investigators to assist in the location and interview of witnesses. ...

**GROUND FOUR**: Was counsel ineffective in failing to place an objection to the State's Brady violation?

**SUPPORTING FACTS**: Counsel repeatedly failed to object to the State's highly prejudicial and inflammatory use of evidence presented and displayed to the jury without proper identification or any ties to the charges involved. ...

**GROUND FIVE**: Was counsel ineffective in failing to obtain a crime scene expert to conduct an independent examination of the evidence and crime scene?

**SUPPORTING FACTS**: Counsel failed to secure or conduct an independent examination of material evidence prior to its admittance at trial resulting in prejudice to petitioner at trial ...

**GROUND SIX**: Was counsel ineffective in failing to obtain to the trial Court's failure to charge the jury on mere presence?

**SUPPORTING FACTS**: The Petitioner contends trial counsel was ineffective in his failure to object to the trial courts failure to charge mere presence during jury instructions ...

**GROUND SEVEN:** Was counsel ineffective in failing to object to the chain of custody in regard to the palm-print presented at trial?

**SUPPORTING FACTS**: The chain custody evidence sheet does not contain Ron Smith's signature, from the Mississippi Crime Lab; but he was allowed to testify at trial regarding petitioner's alleged pam print on the victim's arm.

6

**GROUND EIGHT**: Was defense counsel ineffective in failing to object to that portion of the Solicitor's closing argument that vouched for a witness's credibility?

**SUPPORTING FACTS**:  During the closing argument the Solicitor talked about State's witness, Lavonda Shaw who testified about petitioner at trial ... Defense counsel did not object to the Solicitor's vouching for this witness. He admitted at the PCR hearing that he did not object. ...

On July 2, 2007, the respondent filed a motion for summary judgment.  By order filed July 6, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion.  The petitioner filed his opposition to the motion on September 4, 2007.

## APPLICABLE LAW

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

7

## **ANALYSIS**

***Procedural Bar***

In ground five, the petitioner alleges that trial counsel was ineffective in failing to obtain a crime scene expert to conduct an independent examination of the evidence and crime scene. In ground six, the petitioner contends that trial counsel was ineffective in his failure to object to the trial court's failure to give a "mere presence" jury charge. In ground eight, the petitioner alleges that trial counsel was ineffective because he did not object to that portion of the solicitor's closing argument that vouched for the credibility of witness Lavonda Shaw, who testified against him at trial. The petitioner did not obtain rulings on these claims from the PCR judge, and the appellate court could not and did not address the claims. *See Pruitt v. State*, 423 S.E.2d 127, 128 (S.C. 1992) (issue must be raised to and ruled on by the PCR judge in order to be preserved for review); *Plyler v. State*, 424 S.E.2d 477, 478 (S.C. 1992) (same).

If a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts. In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). The petitioner has made no such showing. Accordingly, grounds five, six, and eight are procedurally barred.


***Ground One***

In ground one, the petitioner alleges that the trial court erred in failing to grant his directed verdict motion. The respondent argues that the PCR judge's denial of relief on

this allegation was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

"'Though claims of insufficient evidence are cognizable on collateral review, a federal court's review of such claims is 'sharply limited.'" *Wilson v. Greene*, 155 F.3d 396, 405 (4th Cir. 1998) (citing *Wright v. West*, 505 U.S. 277, 296 (1992)). Federal review of the sufficiency of the evidence to support a petitioner's state court conviction is not meant "to consider anew the jury's determination of guilt or to replace the State's system of direct appellate review." *Id.* at 405-06. *See also Wright*, 505 U.S. at 292. Therefore, a defendant is entitled to review only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (footnote omitted); *George v. Angelone*, 100 F.3d 353, 357 (4th Cir. 1996). The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16. Also, a federal reviewing court must consider circumstantial as well as direct evidence and allow the government the benefit of all reasonable inferences from the facts proven to the facts sought to be established. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Further, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). *See also Jackson*, 443 U.S. at 318-319 ("[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'"). Finally, when faced with evidence that allows conflicting inferences, this court must presume that the jury resolved such conflicts in the State's favor. *Jackson*, 443 U.S. at 326.

As argued by the respondent, applying this criteria to the case at bar, it is clear that the petitioner was not entitled to a directed verdict on the charges against him. The direct and circumstantial evidence presented at the petitioner's trial was that, in May 1998, the victim (Stephanie Chris Ford Quinn) and her infant son lived in an apartment complex

9

located about one mile off of Augusta Road in Greenville, South Carolina (App. 34-35; 63; 84-85; 177). The petitioner lived in the same complex, as did his mother and his girlfriend, Lavonda Shaw. The victim's apartment was directly across a very short breezeway from Shaw's apartment (App. 39-40; 91-92; 96; 176).

On May 22, 1998, Theodore Waldman, who had known the victim for approximately one week and had planned to spend Memorial Day with her, went to her residence "right after" he got off from his job as a painter. After speaking to her, he went to his residence and showered. When he returned to her residence between 7:00 and 7:30 p.m., two children and a couple "from across the hall" were also in the victim's apartment. The man was introduced to Waldman as the woman's boyfriend, "Orlando," and he positively identified the petitioner as the man he met. The victim was "very jumpy, very wired," and he could tell that she had been drinking. Eventually, Waldman left the victim's apartment; the woman "from across the hall" was no longer there, but the petitioner was there.

The following day, Waldman made several phone calls to the victim. Because she did not answer, he went to her apartment (App. 169-73; 180). Waldman discovered upon his arrival that the victim's door was partially open. The door opened even further when he knocked on it. Waldman called out, but the victim did not answer. He then pushed the door open "and again, asked hello." He saw "[b]urnt spots on the couch and floor," and the victim was lying on the floor at the other end of the couch "past the coffee table." He dropped to one knee and testified that he felt "sick to my stomach." He dialed 911 without ever touching the victim. During the 911 call, he was asked to see whether the victim was still breathing. Again, he did not touch her (App. 173-75). Next, Waldman stepped over her body, without touching her; and he ran down the hallway to check on the victim's baby. He found the baby. After making sure the baby was fine, he knocked on Shaw's apartment door but did not get anyone to answer. He also knocked on a downstairs apartment door without anyone responding. He then waited on law enforcement to arrive, and he gave a written

10

statement to them.  He subsequently provided voluntary blood, hair, and fingerprint samples to the Greenville County Sheriff's Department (App. 175-78).

Eric Burts testified that he dealt crack to the victim before her death.  He had known her for about one or one-and-a-half years.  He saw her three times on May 22, 1998. He first went to her apartment around 6:00 or 6:30 p.m. after she paged him "for some crack."  He was accompanied by a Marcus Martin on this occasion.  He used the phone, then he left her apartment and went to "Augusta Hills" where he "hangs out."  Burts returned to her apartment later and sold her more crack.  A woman he knew as "Shirley Jean" was present at the apartment.  He and a friend drove Shirley Jean and her boyfriend to work before returning to Augusta Hills (App. 182-85).  Burts went back to the victim's apartment around midnight and sold her more crack.  Michael Richardson and Benny Irby went with him.  This time he entered and left through the back door to her apartment.  In addition to one of her children, the petitioner was present.  Burts had known the petitioner for 15 years or longer.  Burts did not have any further contact with either the victim or the petitioner that night.  He further testified that it was possible that the petitioner was aware he was bringing drugs to the victim on his final visit (App. 185-87).

Deputy Jeff Maxwell of the Greenville County Sheriff's Office was the first member of law enforcement to arrive on May 23, 1998.  Theodore Waldman was inside the victim's apartment and near the door when he got there.  Waldman was still talking to the dispatcher.  State's Exhibit 8, a photograph of the scene, accurately depicted what Deputy Maxwell saw that day.  "The couch had a good amount of what appeared to be blood on it. The victim had blood on her face and there was blood on the floor."  As he was securing the scene with tape, the petitioner walked out of the apartment across the breezeway from the scene.  He was wearing a plaid shirt and khaki pants and he was carrying a fishing pole (App. 34-39; 41-42).  The petitioner did not immediately say anything, so Deputy Maxwell asked him who he was and where he lived.  The petitioner said his name was Orlando

11

Smith, and he indicated he lived in an apartment in the complex other than the one he had just exited. When asked why he had come out of the apartment across from the victim, he said that his girlfriend, Lavonda Shaw, lived in that apartment (App. 39). Deputy Maxwell then spoke to Shaw, who said that the petitioner was her boyfriend. According to Deputy Maxwell, EMS personnel found the victim's baby (App. 39-40).

On May 23, 1998, Deputy Ray Allen was a forensic technician with the Greenville County Department of Community Services. He and another technician responded to the victim's apartment on May 23rd and processed it (App. 44-45). He testified as follows:

> Upon arrival we went up to the apartment. The door was already open. Entering the apartment there was a sofa on the other side, it was kind of front living room area. We could see what looked to be suspected blood on the couch, there was pillow that had blood on the couch. There was blood on the carpet directly in front of the couch. Just down to the right of the couch was a coffee table and to the right of the couch was an end table. The victim was lying face up, she was not clothed from the waist down. She had a bra on. Her shirt was pulled up above the bra. Her hands were kind of up over her head. She had what appeared to be trauma to her head and neck area and had suspected blood about her head and face.
>
> Also looking at her arm on the initial entry to the scene, I observed some patterns on her arm as her arm was above, kind of laying on her head, that were to me almost indicated like separations of fingers, there was four, to be distinct patterns were there was suspected blood, then a space with no blood, and there are four about finger width apart. Maybe think that maybe she had been touched in that area and we decided that we would process her later to see if we could get any suspected prints off her.

(App. 45-46). Deputy Allen testified that photographs taken by him accurately depicted the crime scene – including he position of the victim's body – and the area outside the scene (App. 47-50).

Deputy Allen collected clothing items and a swabbing of suspected blood on the coffee table next to the body, and he processed the entire apartment for latent prints.

12

He also photographed the suspected print on the victim's left bicep at autopsy. He also recovered three individual hairs from the body, as well as fingernail clippings (App. 50-55). In May 1998, Paul Wilkerson was employed as a latent print examiner in the Forensic Division in Greenville County. The latent lifts taken from the victim's apartment were compared to the known prints of the victim, Eric Burts, Theodore Waldman, and the petitioner. One print was identified as that of the victim. There were a number of unidentified prints, and four prints from a white plastic bag found on the kitchen floor were made by Waldman. Wilkerson explained that it was not unusual to find prints from persons known to have been in a room or home (App. 60-64).

The most significant evidentiary item in this case was the suspected print on the victim's left bicep. After examining both a photograph of this item (State's Ex. 33) and the enlargement of that picture (State's Ex. 34), Wilkerson was "reasonably certain" that this print had been made by the petitioner's left palm; however, he testified that it was very difficult to see as photographed, and he lacked the necessary equipment to enhance it and make a positive identification. He therefore forwarded the photographs to latent examiner Ron Smith, who had the necessary equipment to make identifications and is "one of the fairly renowned examiners when it comes to palm prints." App. 64-68. Smith, the Associate Director of the Mississippi Crime Laboratory in Meridian, Mississippi, positively identified the print on the back of the victim's left bicep as the petitioner's left palm print. He opined that it was impossible for the print to have been made while the victim's body was in the position where it was found. It was also determined that the blood was on the hand when the victim was touched on her bicep (App. 69-78; 80).

On May 23, 1998, Gene Donohue was employed as an investigator in the Greenville County Sheriff's Office's Violent Crime Scene Unit. There were a number of members of law enforcement present when he arrived on the scene on May 23rd, and the coroner was also present. After being briefed, he briefly viewed the scene. He spoke to

Theodore Waldman while at the victim's apartment, and he later took a statement from Waldman at the Greenville County Law Enforcement Center. Donohue also spoke to both Shaw and the petitioner that day. The petitioner gave Donohue a pair of beige pants, which he retrieved from his mother's apartment (App. 89-96). Later that day, the petitioner gave Donohue the following statement at the Law Enforcement Center:

> I have a 12th grade education. I can read and write. Last night at about 9:30 or 10 I went to Chris' apartment ... . When I got there a white guy was there who I had seen around before. I went inside and conversated for awhile while the guy rolled a joint. Me and the white guy smoked a joint and I left. I went across the street in front of the "B" Buildings with some people from the neighborhood. We was all standing around chilling. I had been outside about 15 or 20 minutes when I seen the white guy drove by in a black camero. I stayed outside for while longer and went in about 2 or 3 in the morning. I went to my girl Lavonda's house ... and went to bed. I got up this morning to go fishing and seen all the police cars outside. End of statement.

(App. 101).

Donohue testified that on May 28th it was learned that the petitioner's left palm print was the bloody print found on the victim's left arm, and he was arrested for murder that day. He then waived his *Miranda* rights and gave another statement (App. 102-08). In this statement, he claimed:

> I lied the other night about what happened before I came home. It was about 4 in the morning and I was going home to my girlfriend's apartment. I stopped because Chris' apartment door was opened. I went in and I seen her laying on the floor with her pants down. I seen blood on her and the floor. I was trying to see what she all right. I nudged her and tried to see did she have a pulse. I checked for her pulse on her neck and her forearm but couldn't find none. Then I realized she was dead. After that I left, went to my girlfriend's house, sat down for a minute, then I fell asleep. I didn't call the police because I was scared and didn't want to be involved.

(App. 101).

Because Donohue had been advised that the cause of death was "strangulation with some type of ligature," he went back to the victim's apartment. On the

back porch, he found a ligature with a small stick.  He retrieved another ligature from a nearby dumpster.  He also obtained a belt that Eric Burts had borrowed and worn on May 23rd (App. 110-13).  Using photographs taken of the victim's neck during the external examination at autopsy, Donohue explained that a number of gouge marks on the victim's neck appeared to have been caused by her efforts to get the ligature used to strangle her off of her neck.  He also demonstrated that most of the force appeared to be right side of her neck (App. 113-15).

Dr. Larry Minnette, a forensic pathologist, testified that the victim's cause of death was from ligature strangulation.  He likewise opined that the gouge marks found on the victim's neck were caused by her efforts to remove the object that was used to strangle her.  A gash on the victim's chin would have bled, as would another laceration above the left ear on her head.  Below the skin, on the right side of the victim's neck, Dr. Minnette found hemorrhage above the strap muscle.  He further opined that the ligature was wrapped tightly around the victim's neck more than once (although he could not say it was wrapped twice) and that "the ligature mark was more continuous on the right side and back."  The victim's blood alcohol level was 0.13% and there was "cocaine and breakdown products of cocaine in her blood and urine" (App. 136-42).

The petitioner's girlfriend, Lavonda Shaw, testified that the petitioner was living with her on May 22, 1998.  He was casually dressed in a pair of khakis and a blue and red shirt when he left her residence between 6:00 and 7:00 p.m. that evening.  "He was dressed to go out," and his pants were clean and pressed.  He came back between 9:00 and 10:00 that night and got a cigarette from Shaw and a beer from the refrigerator.  He was still dressed in the same clothing (App. 203-06).  The petitioner returned to Shaw's residence between 2:30 and 3:00 a.m. on May 23rd and showered, which Shaw testified that he would not normally do.  The next morning, both Shaw and the petitioner saw the police cars at the apartment complex, but the petitioner did not tell her that he knew anything about the victim's

death.  Also, he had a fishing pole with him when he left the apartment, and Shaw was unaware of any previous plan he had to go fishing.  Shaw later spoke with Gene Donohue and permitted him to search her apartment for the clothes the petitioner had been wearing on May 23rd.  She discovered the pants in her son's bedroom, where the petitioner had discarded them.  He admitted that the pants had bloodstains on them.  The petitioner also wrote Shaw a letter and asked her to lie about when he came back on the morning of May 23rd (App. 206-18).

At the conclusion of the State's case, trial counsel moved for a directed verdict. He argued that the State had not proved its case, there was no evidence of motive or even animosity between the victim and the petitioner, and there also was no murder weapon.  He contended the only evidence connecting the petitioner to the offense was the palm print and the opportunity to kill her (App. 219-20).  After listening to the State's reply, the trial judge denied the motion for a directed verdict (App. 220-22).  At the close of all evidence, counsel's renewed motion for a directed verdict was denied (App. 270-74).

The respondent argues that the claim fails on the merits.  The respondent contends that the trial judge properly denied the directed verdict motion because, when the direct and circumstantial evidence is viewed in the light most favorable to the prosecution, it cannot be said that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *George*, 100 F.3d at 357.  South Carolina has defined the crime of murder as the "killing of any person with malice aforethought, either express or implied."  S.C. Code Ann. § 16-3-10 (2003).  "Malice is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong.  *State v. Kelsey*, 502 S.E.2d 63, 69 (S.C. 1998).  "It is the doing of a wrongful act intentionally and without just cause or excuse."  *Tate v. State*, 570 S.E.2d 522, 527 (S.C. 2002)."

The victim in this case was clearly murdered.  She was found nude from the waist down with her shirt pushed up over her bra.  Although the rape protocol on the victim

did not reveal the presence of semen (App. 151) and the pathologist testified that he did not see evidence of injury during his external and internal examination of her genitalia (App. 140), it is a reasonable inference from the manner in which she was found that there was possibly at least an attempted sexual assault. The jury could infer malice from these facts. *See State v. Mouzon*, 99 S.E.2d 672, 676 (S.C. 1957) (malice may be inferred from an act so reckless as to manifest depravity of mind and disregard of human life); *State v. Kinard*, Op. No. 4242, 2007 WL 1324462, *1 (S.C. Ct. App., May 7, 2007) ("'Malice aforethought' ... utilizes four possible mental states to encompass both specific and general intent to commit the crime. These four possibilities are intent to kill, intent to inflict grievous bodily harm, extremely reckless indifference to the value of human life (abandoned and malignant heart), and intent to commit a felony (felony murder rule). . . . 'General intent' is defined as 'the state of mind required for the commission of certain common law crimes not requiring specific intent' and it 'usually takes the form of recklessness . . . or negligence.'") (citations omitted). Further, the victim was killed by ligature strangulation, *i.e.*, with a deadly weapon, evidence from which the jury could infer the presence of malice. *See Sellers v. State*, 607 S.E.2d 82, 85 (S.C. 2005) (malice may be inferred from the use of a deadly weapon). Thus, in the absence of any explanation that would reduce the killing to voluntary manslaughter, the victim's homicide was a murder.

Further, although the evidence linking the petitioner to the crime was circumstantial, it was sufficient to create a jury issue as to proof of identity. First, he was the last person seen with the victim while she was alive. It was possible that he knew Burts had brought crack to her house, and his girlfriend's residence was within a few feet of the victim's. Second, the petitioner was neatly and cleanly dressed when he left Shaw's apartment on May 22nd. However, he returned to her residence between 2:30 and 3:00 a.m. on May 23rd and showered. He also threw away the pants he had been wearing and admitted they had blood stains on them. He eventually asked Shaw to lie for him about the clothes

17

he wore on May 22nd, and he did not initially admit to her that he knew anything about the victim's death.  More importantly, his bloody left palm print was found on the back of the victim's left bicep.  It was left after his hand had blood on it, and it was impossible for him to have left the print in this location after her body was in the position in which Waldman found it.  The petitioner also gave two inconsistent stories to law enforcement. The first denied any knowledge of the killing; in the second, he admitted finding the victim and touching her.  However, it was, once again, impossible for him to have left his bloody left palm print in the manner he described to the officers.

As argued by the respondent, all of the petitioner's arguments contrary to this evidence go more to the weight he believes the State's evidence should have received by the trier of fact rather than to the sufficiency of the evidence.  Based upon the foregoing, this allegation fails.


***Ground Two***

The petitioner next contends that his trial counsel was ineffective in failing to subpoena potential witnesses.  The respondent argues that the PCR judge's denial of relief on this ground was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  In state PCR proceedings, the petitioner testified that he had given his trial counsel the names of several witnesses:  Bennie Irby, Shirley Jean Robinson, Carolyn Bell, Eric Burts, and other witnesses. He also told counsel these witnesses would be of assistance to his defense, and he asked counsel to subpoena them for trial.  He subpoenaed a "couple of them."

The petitioner added that a number of witnesses were under subpoena but did not show for trial, including Shirley Jean Robinson.  Counsel told the trial judge they were not present.  The petitioner asserted that Robinson "was a crucial witness ... because she told several people in my neighborhood that she also found the dead body that I found" at

18

the apartment. She also told this to some of the petitioner's family members. Robinson had also seen Burts physically abuse the victim (App. 349-51; 360).

On the Sunday before the petitioner's trial, counsel brought the subpoena for Robinson to the petitioner and said that he did not know where Robinson lived. The petitioner stated that Robinson lived in the building next to him, and he gave the subpoena to his (the petitioner's) girlfriend, who served Robinson. However, "she said she wouldn't be coming because she didn't want to get involved. And she never showed up" (App. 351; 369).

The petitioner further testified that he told counsel that Carolyn Bell "was going to be one of the suspects – part of their defense." The petitioner grew up with Eric Burts and described him as "one of the prime suspects." The petitioner saw Burts at the victim's apartment three or four times on the night of the killing and stated that Burts was selling drugs to the victim. He allegedly "was missing" for two hours after midnight, and Bell was his alibi because he claimed, at trial, that he was having sex with her. Bell never testified. The petitioner stated that, to his knowledge, no one ever spoke with her (App. 351-52; 359-60).

The petitioner further testified that it was his understanding that Bennie Irby had given a belt to Burts on the evening the victim was murdered. The State had supposedly waved the belt during closing argument. There was no testimony presented at trial that Irby gave the belt introduced by the State to Burts. Trial counsel did not find or speak to Irby. However, the petitioner had seen statements by Irby that had been taken by a private investigator (App. 358-59). On cross-examination, the petitioner admitted that his trial counsel had cross-examined Burts at trial (App. 369-70).

The petitioner also testified that the victim had a conversation with her mother-in-law and said that she believed that "a neighbor had stolen her billfold" on the morning before she was killed. However, her mother-in-law did not testify (App. 360-61).

Carolyn Bell testified at the PCR hearing that she knew Eric Burts.  She was "sure" Burts unexpectedly showed up at her residence sometime close to when the homicide occurred in May 1998, but she did not remember the date.  She used to date him but was not dating him at that time.  She did recall that he showed up at her residence "one night unexpectedly."  However, he only stayed there "15 or 20 minutes," and they did not have sex. That was the last time that she saw him.  She was not contacted by trial counsel, but she admitted that she was staying with her grandmother beginning in November 1999 and had moved to another address at the time of the petitioner's trial (App. 375-80).

The petitioner's trial counsel testified that he received discovery from the State in the petitioner's case.  He made a copy of the discovery and sent it to the petitioner.  He also reviewed the discovery with his client.  Although the information was not exculpatory, he remembered two things that had been disclosed.  First, there was a statement by the petitioner's girlfriend, Lavonda Shaw, that the petitioner hid some bloody pants underneath her son's bed on the night of the killing.  Also, he received a copy of a letter the petitioner had written to Shaw in which he asked "her to lie about the time he got home."  When shown the letter, the petitioner admitted that he had written it to her from jail (App. 381-83).

The trial counsel also testified that he had Carolyn Bell's name from Eric Burts' statement.  He added that "in cases like [this one], is people usually are friends or are known to the Defendant.  I'll ask them to get them all together if they can."  In the present case, he went to either the petitioner's apartment or the apartment of his sister or mother, and counsel "interviewed them and gave them subpoenas. ... I would either serve them or ... in this case, his girlfriend served them."  He could not find Bell, and Robinson did not show even though subpoenaed.  Counsel's recollection was that Robinson could have testified that "[s]he went in, too, and didn't call the police."  However, she would not have negated that the petitioner also went inside "and handled the body."  He did not think she was a crucial witness, whereas he wished that he could have found Bell (App. 384-85).

20

Trial counsel testified that Robinson could have also testified to incidents of physical abuse of the victim by Burts, and this "may have helped point some more fingers at the drug dealer," which was consistent with his theory of the case. "But she was very reluctant. She said she wasn't coming and she wasn't going to say anything when she got on the witness stand. ... I didn't know if she was going to help me or not" (App. 385). Several of the other witnesses appeared at trial and testified (App. 386; *see also* App. 251-69).

Trial counsel testified that "they didn't have a number for [Bell]. They said they thought she lived in these apartments." He went and searched for her but was unable to find her "and they never could furnish me a number for her." He would liked to have found her (App. 386).

With respect to Bennie Irby's statement about the belt, trial counsel testified that he did not recall the belt being introduced into evidence. He also thought that the prosecutor's statement that the State did not have a motive for the crime helped the defense, as did the admission that there was no murder weapon (App. 386-87). On cross-examination about Irby's statement to police that the victim owed Burts money for crack, trial counsel indicated that he had argued in closing argument that this was why Burts had killed the victim. He also did not recall being provided with evidence in discovery that the victim had called her grandmother earlier on the evening of her death and said her wallet had been stolen from the apartment. However, he did not think that evidence the victim, who worked at Burger King, owed money to Burts for crack was critical (App. 390-91). With respect to his failure to interview and present Irby as a witness, counsel admitted that he had not spoken to Irby to determine whether the belt that Burts provided to law enforcement was the same belt Irby had loaned to Burts. However, counsel's recollection was that the belt was not consistent with the ligature marks found on the victim's neck, which were narrower (App. 391-92).

21

In the order of dismissal, the PCR judge did not "find the Applicant's or his witness' testimony to be credible on the issues in this case. Trial counsel's testimony is found credible. This Court finds that the Applicant has failed to show that his trial counsel rendered ineffective assistance" (App. 410). The PCR judge further found:

> Shirley Robinson did not testify at the PCR hearing, so any evidence she might have offered is unavailable. Therefore, this Court finds that there is no reasonable probability that the result would have been different but for those errors. Regarding the failure to call witnesses and the failure to hire an investigator, this Court finds neither deficient performance nor prejudice. The witness offered by the Applicant, Caroline Bell, offered no testimony that this Court finds would have had a reasonable probability of affecting the outcome of the proceeding. Since Bell's testimony was the main thing that the investigator would have offered, no prejudice arose from the failure to hire an investigator.

(App. 410-11).

Claims of ineffective assistance of counsel are governed by the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687. To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that the deficient performance actually prejudiced him, *i.e.* "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Finally, the Court in *Strickland* held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697. Review of counsel's performance is "highly deferential." *Id.* at 689.

The respondent argues that, applying the foregoing law, it is clear the petitioner's argument lacks merit. This court agrees. First, counsel's testimony supports the

conclusion that he was not deficient because he made reasonable efforts to subpoena each of the witnesses his client told him might assist in the defense. For example, Robinson was under subpoena but declined to attend trial. Counsel explained that "she was very reluctant. She said she wasn't coming and she wasn't going to say anything when she got on the witness stand. ... I didn't know if she was going to help me or not" (App. 385). Moreover, several of the other witnesses appeared at trial and testified (App. 386; *see also* App. 251-69).

Because Robinson did not testify at the PCR hearing, the petitioner cannot show prejudice from counsel's error, either in this court, *Bassette v. Thompson*, 915 F.2d 932, 940 (4th Cir.1990) (holding petitioner's allegation that attorney was ineffective due to lack of investigation does not support relief absent proffer of the supposed witness's favorable testimony), or in state court. *See Dempsey v. State*, 610 S.E.2d 812, 814 (S.C. 2005) ("A PCR applicant cannot show that he was prejudiced by counsel's failure to call a favorable witness to testify at trial if that witness does not later testify at the PCR hearing or otherwise offer testimony within the rules of evidence.").

Bennie Irby likewise did not testify at the PCR hearing. Moreover, the PCR judge did not address counsel's failure to interview and present Irby as a witness in the order of dismissal. Therefore, the allegation with regard to Irby is procedurally defaulted. The procedural default can only be excused if a habeas petitioner can demonstrate both cause for the procedural default and prejudice as a result of the alleged constitutional violation, or if he can demonstrate that failure to review the constitutional claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 749-50. As argued by the respondent, the petitioner cannot show cause for the default since he could have but did not make a Rule 59(e), SCRCP, motion.

Counsel also was not deficient in his efforts to contact Carolyn Bell. Even though neither the petitioner nor his family ever provided an address or number to counsel,

counsel personally made an unsuccessful search for her. Also, she testified in PCR that she had at least two addresses between the murder and the petitioner's trial. More importantly, the petitioner has failed to prove any prejudice because Bell's PCR testimony clearly reflects she did not know the date that Burts had unexpectedly shown up at her home (App. 375-80). Also, Burts never claimed at trial that he was with Bell that night (App. 189-91). Thus, she would not have been able to impeach Burts' testimony. Based upon the foregoing, this allegation lacks merit.

### Ground Three

In this ground, the petitioner alleges that trial counsel was ineffective for failing to conduct an adequate pretrial investigation and for failing to seek funds for "investigators to assist in the location and interview of witnesses." The PCR judge found as follows:

> Regarding the failure to call witnesses and failure to hire an investigator, this Court finds neither deficient performance nor prejudice. The witness offered by the Applicant, Caroline Bell, offered no testimony that this Court finds would have had a reasonable probability of affecting the outcome of the proceeding. Since Bell's testimony was the main thing that the investigator would have offered, no prejudice arose from the failure to hire an investigator.

(App. 441). As noted by the respondent, the only other individual to whom this allegation applies based upon the current record is Irby. However, for the reasons set forth in ground two, the state PCR judge's denial of relief on this allegation was not contrary to and did not involve and unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground Four

In ground four, the petitioner alleges that "[c]ounsel repeatedly failed to object to the State's highly prejudicial and inflammatory use of evidence presented and displayed

to the jury without proper identification or any ties to the charges involved." Specifically, he complains about counsel's failure to obtain a videotape of the crime scene through discovery pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and counsel's failure to object to several items that he contends were not disclosed to the defense, including crime scene photographs and the letter Shaw testified that the petitioner wrote to her.

The respondent argues that the portion of this allegation alleging failure to disclose the videotape was procedurally defaulted under *Coleman* by the petitioner's failure to obtain a ruling thereon by the PCR judge because this barred the state supreme court's consideration of the claim on certiorari. *See Pruitt*, 423 S.E.2d at 128 (issue must be raised to and ruled on by the PCR judge in order to be preserved for review). This court agrees.

As to the remaining allegations, the respondent contends the state PCR judge's denial of relief was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The petitioner testified at trial that he wrote State's Exhibit 32 to Shaw. He also admitted that, in the letter, he asked her to tell officers that she did not remember if they asked about the clothing he wore on the night of the killing. He further admitted that his purpose in writing the letter was to cover up the fact he had the bloody pants (App. 245-46).

At the PCR hearing, the petitioner testified that he was never shown any photographs before trial and did not see any until the day of his trial. Counsel did not object to the photographs. The petitioner also did not know that a videotape of the crime scene had been made. He claimed that none of these items had been provided to trial counsel (App. 352-56). According to the petitioner, his trial counsel indicated that he had not seen he photographs until the morning of the trial (App. 361).

Trial counsel testified in the PCR hearing that he received discovery from the State in the petitioner's case. He made a copy of the discovery and sent it to the petitioner. He also reviewed the discovery with his client. Although the information was not exculpatory,

trial counsel remembered two things that had not been disclosed prior to trial.  First, there was a statement by the petitioner's girlfriend, Lavonda Shaw, that the petitioner hid some bloody pants underneath her son's bed on the night of the killing.  Also, prior to trial, trial counsel was not aware of the letter the petitioner had written to Shaw in which he asked "her to lie about the time he got home."  When shown the letter, the petitioner admitted that he had written it to her from jail (App. 381-83).  Trial counsel's recollection was that the crime scene photographs were not very inflammatory "or highly prejudicial."  They also showed a tampon, which counsel felt was "critical" to the defense because it bolstered his theory of the defense:  that Burts got mad "because he couldn't have sex with [the victim]" (App. 383). He did not object to the autopsy photograph because the jury had already seen the crime scene photographs, so he did not view it as prejudicial (App. 392). Counsel was not aware of any videotape of the crime scene but was provided copies of the photographs (App. 397-98).

    The state PCR judge rejected the petitioner's allegation.  He first found that the petitioner and his witnesses were not credible, whereas counsel was credible.  He thereafter found:

> While trial counsel's failure to object to the letter being provided the morning of the trial . ... may have been deficient, this Court finds no prejudice to the Applicant from those errors.  The Applicant had the opportunity to respond to the letter in his testimony, as well as to cross-examine his girlfriend, who had turned over the letter to the Solicitor. ...  The photos offered to the trial court were not more prejudicial than probative, therefore this Court finds that no objection to them was warranted. The failure to test the hair samples or to challenge the palm print do not create a valid claim of ineffective assistance of counsel either.  No evidence was presented to this Court that would show that either action would have had a reasonable probability of changing the result of the proceeding.

(App. 440-41).

This court agrees. In *Strickler v. Greene*, 527 U.S. 263 (1999), the United States Supreme Court stated the applicable law under *Brady v. Maryland*, 373 U.S. 83 (1963), as follows:

> In *Brady* this Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ... We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, ... and that the duty encompasses impeachment evidence as well as exculpatory evidence. ... Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ... Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."

*Id.* at 280-81 (citations omitted).

The Court in *Strickler* observed that "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence"; however, "strictly speaking, there is never a real '*Brady* violation' unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. Thus, the Court recognized three components of a true *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82. The Court later explained the materiality prong under *Brady* as follows:

> As we made clear in *Kyles*, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. .... Rather, the question is whether "the favorable evidence could

27

> reasonably be taken to put the case in such a different light as
> to undermine confidence in the verdict."

*Id*. at 290 (citations omitted).

The letter to Shaw and the statement by Shaw about the bloody pants do not appear to be exculpatory or impeaching so as to require disclosure under *Brady*. Furthermore, as argued by the respondent, the petitioner admitted at trial that he in fact wrote the letter to Shaw.  Further, the petitioner has not shown that the photographs offered to the trial court were more prejudicial than probative so as to warrant an objection by trial counsel.  Trial counsel testified that he felt the photographs helped the petitioner's case because they bolstered his theory of the defense:  that Burts got mad "because he couldn't have sex with [the victim]" (App. 383).  The PCR court found trial counsel's testimony credible.  Furthermore, as argued by the respondent, since the petitioner did not introduce the letter or photographs into the record, he cannot show materiality; likewise, he cannot show prejudice from the default as to the videotape because he did not introduce such tape and has not proven that such a tape even exists.  The petitioner has not shown that the state PCR judge's denial of relief was contrary to and  involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Based upon the foregoing, this claim fails.

**Ground Seven**

In ground seven, the petitioner argues that counsel was ineffective in failing to object to the chain of custody in regard to the palm print that was found on the victim's left bicep.  The respondent argues that the state PCR judge's denial of relief on this allegation

was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

At trial, the State introduced two statements by the petitioner. In the second statement, the petitioner stated, "I nudged her and tried to see [if] she ha[d] a pulse. I checked for her pulse on her neck and her forearm" (App. 108). He testified at trial that "I touched her. That is my handprint" (App. 230). The petitioner testified at the PCR hearing that he never saw the standards used by Paul Wilkerson and Ron Smith (*see* App. 60-81), who positively identified the bloody print on the victim's arm as being his left palm print. Also, trial counsel never hired an expert to make an independent comparison, and counsel did not object to the analysis being done by officers from Mississippi (App. 354-55, 364).

Trial counsel received discovery from the State, and he reviewed this discovery with the petitioner (App. 381-82). Counsel testified that the petitioner had told him that he touched the victim's body and his print got on her body when he turned her over. Counsel further testified, "That's why I didn't want to go into a lot of detail about it" (App. 384; *see also* App. 395 ("[Petitioner] said that he had moved the body. And he had touched the body and he had gotten blood on himself. So I didn't worry about that." Rather, counsel assumed the print was made by his client)). Counsel was provided with a copy of the print photo. He testified that he did not seek to have an independent analysis after the petitioner admitted to him that he had gotten bloody and turned over the body because he did not think the evidence was that critical at that point (App. 395-97).

In the order of dismissal, the PCR judge found that "[t]he failure . . . to challenge the palm print do[es] not create a valid claim of ineffective assistance of counsel either. No evidence was presented to this Court that would show that [such a challenge] would have had a reasonable probability of changing the result of the proceeding" (App. 441).

This court agrees with the respondent that the petitioner has not shown that trial counsel's failure to object to the chain of custody with regard to the palm print prejudiced him. *See Strickland*, 466 U.S. at 687 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."). The petitioner did not present any expert testimony that the print was made by anyone other than himself, and more importantly, he testified at trial that he made the print. Further, he did not present any evidence that there was a defect in the State's chain of custody. In light of the petitioner's trial testimony and the overwhelming circumstantial evidence of guilt he cannot show a reasonable probability of a different result under *Strickland*, and this allegation lacks merit.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment be granted. Any pending nondispositive motions will be held in abeyance pending the district court's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, these motions will be rendered moot.

s/William M. Catoe
United States Magistrate Judge

January 23, 2008

Greenville, South Carolina

30