IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Orlando Smith, #267982,         )
                                     )     Civil Action No. 6:07-0327-RBH-WMC
                Petitioner,  )
                                     )     **REPORT OF MAGISTRATE JUDGE**
     vs.                            )
                                     )
Warden of Broad River         )
Correctional Institution,       )
                                     )
                Respondent.  )
_____)

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

## BACKGROUND OF THE CASE

The record reveals that the petitioner is currently confined in the Broad River Correctional Institution of the South Carolina Department of Corrections ("SCDC"), pursuant to commitment orders from the Greenville County Clerk of Court. The Greenville County Grand Jury indicted the petitioner at the October 2001 term of court for murder (98-GS-23-5212). Attorney C. Timothy Sullivan represented him on these charges. On July 17-19, 2000, the petitioner received a jury trial before the Honorable Larry R. Patterson, and he was found guilty as charged. Judge Patterson sentenced him to 30 years imprisonment.

The petitioner timely served and filed a notice of appeal. Appellate Defender Joseph Savitz represented him on appeal to the South Carolina Court of Appeals. On November 8, 2001, Mr. Savitz filed a Final *Anders* Brief of Appellant[1] on the petitioner's behalf and petitioned to be relieved as counsel. There was only one issue presented in the brief:

> The judge erred by refusing to direct a verdict acquitting appellant of murder.

The petitioner filed a *pro se* "Initial *Anders* Brief" on December 31, 2001. His *pro se* "Brief" actually consisted of motions for the Court of Appeals to (a) "compel production of complete audio cassette record of trial based upon appellant's assertion the transcript as furnished is not accurate; and (b) for an order to stay proceeding[s] pending production of requested evidence; and (c) for order staying timely Rule germane to filing of Pro Se meritorious brief of appellant and for (d) enlargement of time in sum of ninety (90) days pending efforts of our family to retain private counsel in this case." Assistant Deputy Attorney General Donald J. Zelenka represented the State on appeal.

On May 23, 2002, in an unpublished opinion, the South Carolina Court of Appeals dismissed the petitioner's appeal and granted counsel's request to be relieved. *State v. Orlando F. Smith*, 02-UP-372 (S.C. Ct. App. filed May 23, 2002). The South Carolina Court of Appeals sent the remittitur to the Greenville County Clerk of Court on June 25, 2002.

The petitioner filed a *pro se* post-conviction relief ("PCR") application (02-CP-23-6327) on September 17, 2002. He alleged the following grounds for relief in his application (verbatim):

> (1)    Counsel. Pre-trial, failed to conduct proper and thorough investigation of the material facts of this case, thereby,

---

[1] *See Anders v. California*, 386 U.S. 738 (1967).

2

rendering the final decision a most prejudicial one in view of the facts of this case.

(2)   Failure to properly raise objection to Judge Larry R. Patterson's refusal to direct a verdict acquitting appellant of murder resulted in applicant becomming procedurally barred to raise claim as his first right on direct appeal, which results in ineffective assistance of trial counsel and establishes a grave prejudice to applicant therefrom.

(3)   Counsels failure to subpeona certain of applicants witnesses resulted in eneffective assistance of trial counsel and results in prejudice to this applicant.

(4)   That the combined - errors contributed by trial counsel led to a situation where the culmulative effect doctrine as to this instant case, is triggered due to the resulting prejudice it created to this applicant.

(5)   Trial counsels failure to object to certain of the states trial evidence which had been inadmissible results in ineffective assistance of trial counsel in a case where the state prevailed in a matter which rests purely upon the factor of supposition however patently lacking in evidence. (Note; this is a case in which the court failed to view the evidence impartially and HAD the lower court to have made such as assessment, ..., it must direct a verdict of acquittal if there is no direct or substantial circumstantial evidence reasonable tending to prove the guilt of the accused if in which his guilt might be fairly and logically deduced. In the present case, the only 'evidence' ... merely raised the suspicion of the accused and was not sufficient to survive a directed verdict. ...

(6)   But for the errors and ommission of trial counsel, the result would have been favorable to this applcant.

(7)   But for counsels errors and omissions, applicant would not presently stand unconstitutionally convicted of a crime applicant did not commit.

(8)   Counsel may not articulate valid reasons for the plethora of ommissions and ineffective assistance afforded this applicant during jury trial of the case ...

(9)   Counsel spent inadequate time in pre-trial (a) conference with this applicant, (b) in pre-trial investigation activity and was not (c) prepared for trial in this case.

(10)    Counsels ineffectiveness was so pervasive, the applicant may be exempt from proving actual prejudice ...

(11)    Counsels failure to motion, pre-trial for a psychological exam in view that applicant informed counsel that he was at the periods both (a) on probation and (b) under the influence of drugs constitutes ineffective assistance of counsel, among other things., each being germane to this case and cobined, does trigger doctrine of cumulative error, particularly where, as in the instant case, applicant is not guilty of having committed any crime whatsoever and was falsely accused and convicted due to ineffective counsel.

The State filed its return on May 2, 2003.

The Honorable Edward W. Miller held an evidentiary hearing into the matter on October 22, 2003, at the Greenville County Courthouse.  The petitioner was present at the hearing and represented by attorney John A. O'Leary.  Assistant Attorney General Christopher L. Newton represented the State.  The petitioner testified on his own behalf and presented the testimony of Carolyn Bell.  The State presented the testimony of trial counsel, Mr. Sullivan.  The PCR court left the record open for 60 days so the State could file a memorandum and the petitioner could submit scientific evidence (resp. supp. m.s.j., ex. 1).  In a memorandum dated December 15, 2003, the State asked the court to deny and dismiss the application for PCR (App.  413-16).  In a memorandum dated December 16, 2003, the petitioner's PCR counsel outlined arguments in the context of the scientific evidence and reports that were not available to the petitioner's counsel at the time of the PCR hearing.  Counsel noted that he and his private investigators reviewed certain evidence, as ordered by the PCR court, on November 24 and December 3, 2003 (App. 417-32).  Attached to the memorandum and referenced as an exhibit in the memorandum was the affidavit of private investigator Danny McDaniel (App. 433-34).  PCR counsel also referenced an Exhibit B to his memorandum, which was an affidavit by M. Bruce Jernigan, a retired criminology instructor and crime scene analyst (App. 425).

4

By order of March 31, 2004, Judge Miller denied and dismissed the application. A timely notice of appeal was served and filed. After the notice of appeal was served and filed, the petitioner submitted a *pro se* Rule 59(e), SCRCP, motion, asking the PCR judge to alter or amend the judgment, both with respect to his claim that the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963) and his contention that trial counsel was ineffective for not adequately investigating the case and not viewing the videotape of the scene (Ground Four). The PCR judge summarily denied the petitioner's motion in an order filed on June 15, 2004.

Assistant Appellate Defender Robert M. Pachak represented the petitioner in collateral appellate proceedings. On August 9, 2004, Mr. Pachak filed a *Johnson*[2] petition for writ of certiorari and a petition to be relieved as counsel. The only question presented in the *Johnson* petition was stated as follows:

> Whether defense counsel was ineffective in failing to object to that portion of the solicitor's closing argument that vouched for a witness's credibility.

The State filed a letter in lieu of return to the petition for writ of certiorari on August 11, 2004. On May 16, 2005, the petitioner submitted "PETITIONER'S PRO SE BRIEF." His brief addressed the following issues:

> (1)     Did the PCR court err in failing to find counsel ineffective for failing to subpoena witnesses?
>
> (2)     Did the PCR court err in failing to find counsel ineffective for failing to conduct adequate pretrial investigations?
>
> (3)     Did the PCR court err in failing to find counsel ineffective for failing to object to the prosecution's *Brady* violation?

---

[2]*Johnson v. State*, 364 S.E.2d 201 (S.C. 1988). *Johnson* sets forth the procedures for counsel to follow when filing meritless appeals in state PCR cases pursuant to *Anders*. *Contra Pennsylvania v. Finley*, 481 U.S. 551 (1987) (prisoner, who had no equal protection or due process right to appointed counsel in post-conviction proceedings, also had no right to insist on *Anders* procedures for withdrawal of appointed counsel when collateral counsel determined direct appeal was frivolous).

> (4)     Did the PCR court err in failing to find counsel ineffective in failing to obtain a crime scene expert to conduct an independent examination of the evidence and crime scene?
>
> (5)     Did the PCR court err in failing to find counsel ineffective in failing to object to the trial court's failure to charge mere presence?
>
> (6)     Did the PCR court err in failing to find counsel ineffective in failing to object to the chain of custody?

The South Carolina Court of Appeals filed an order on June 12, 2006, in which it denied certiorari and granted counsel's request to withdraw.  The petitioner sent an untimely petition for rehearing to the South Carolina Court of Appeals on June 26, 2006, which returned the petition for rehearing to the petitioner on July 5, 2006.  The court sent the remittitur to the Greenville County Clerk of Court on July 5, 2006.

In his petition now before the court, the petitioner raises the following allegations (verbatim):

> **GROUND ONE:**  Did trial court error in failing to grant direct verdict motion?
>
> **SUPPORTING FACTS:** Appellate counsel did not file Notice of Appeal in a timely manner and no Petition for Writ of Certiorari was had upon this ground.
>
> **GROUND TWO**: Was counsel ineffective in failing to subpoena potential witnesses.
>
> **SUPPORTING FACTS**: At the PCR hearing, Petitioner secured the testimony of Carolyn Bell and presented Affidavits from several witnesses who could have testified at trial as to critical facts and evidence that would have made a major difference in the outcome of the trial. ... These facts were well presented at the PCR hearing and counsel should have been found ineffective, but was not found to be by the judge. ...
>
> **GROUND THREE**:  Was counsel ineffective in failing to conduct adequate pretrial investigations?
>
> **SUPPORTING FACTS**:  The testimony of counsel reveals that counsel made no efforts at all to seek funds to hire investigators to assist in the location and interview of witnesses. ...
>
> **GROUND FOUR**: Was counsel ineffective in failing to place an objection to the State's Brady violation?

6

**SUPPORTING FACTS**: Counsel repeatedly failed to object to the State's highly prejudicial and inflammatory use of evidence presented and displayed to the jury without proper identification or any ties to the charges involved. ...

**GROUND FIVE**: Was counsel ineffective in failing to obtain a crime scene expert to conduct an independent examination of the evidence and crime scene?

**SUPPORTING FACTS**: Counsel failed to secure or conduct an independent examination of material evidence prior to its admittance at trial resulting in prejudice to petitioner at trial ...

**GROUND SIX**: Was counsel ineffective in failing to obtain to the trial Court's failure to charge the jury on mere presence?

**SUPPORTING FACTS**: The Petitioner contends trial counsel was ineffective in his failure to object to the trial courts failure to charge mere presence during jury instructions ...

**GROUND SEVEN:** Was counsel ineffective in failing to object to the chain of custody in regard to the palm-print presented at trial?

**SUPPORTING FACTS**: The chain custody evidence sheet does not contain Ron Smith's signature, from the Mississippi Crime Lab; but he was allowed to testify at trial regarding petitioner's alleged pam print on the victim's arm.

**GROUND EIGHT**: Was defense counsel ineffective in failing to object to that portion of the Solicitor's closing argument that vouched for a witness's credibility?

**SUPPORTING FACTS**: During the closing argument the Solicitor talked about State's witness, Lavonda Shaw who testified about petitioner at trial ... Defense counsel did not object to the Solicitor's vouching for this witness. He admitted at the PCR hearing that he did not object. ...

On July 2, 2007, the respondent filed a motion for summary judgment. By order filed July 6, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The petitioner filed his opposition to the motion on September 4, 2007. On January 23, 2008, this court entered a Report and Recommendation recommending that the respondent's motion for summary judgment be granted. By order filed March 31, 2008, the Honorable R. Bryan Harwell, United States District Judge, granted summary judgment as to all issues except Ground

7

Five.  Judge Harwell recommitted Ground Five to this court for further findings and review with regard to the procedural default issue, the state court's consideration of post-hearing affidavits, and the *Strickland v. Washington*, 466 U.S. 668 (1984) factors.

## UNDERLYING CRIMINAL CASE

The evidence presented at the petitioner's trial is as follows.  In May 1998, the victim (Stephanie Chris Ford Quinn) and her infant son lived in an apartment complex located about one mile off of Augusta Road in Greenville, South Carolina (App. 34-35; 63; 84-85; 177).  The petitioner lived in the same complex, as did his mother and his girlfriend, Lavonda Shaw.  The victim's apartment was directly across a very short breezeway from Shaw's apartment (App. 39-40; 91-92; 96; 176).

On May 22, 1998, Theodore Waldman, who had known the victim for approximately one week and had planned to spend Memorial Day with her, went to her residence "right after" he got off from his job as a painter.  After speaking to her, he went to his residence and showered.  When he returned to her residence between 7:00 and 7:30 p.m., two children and a couple "from across the hall" were also in the victim's apartment. The man was introduced to Waldman as the woman's boyfriend, "Orlando," and he positively identified the petitioner as the man he met.  The victim was "very jumpy, very wired," and he could tell that she had been drinking.  Eventually, Waldman left the victim's apartment; the woman "from across the hall" was no longer there, but the petitioner was there.

The following day, Waldman made several phone calls to the victim. Because she did not answer, he went to her apartment (App. 169-73; 180).  Waldman discovered upon his arrival that the victim's door was partially open.  The door opened even further when he knocked on it.   Waldman called out, but the victim did not answer.  He then pushed the door open "and again, asked hello."  He saw "[b]urnt spots on the couch and

8

floor," and the victim was lying on the floor at the other end of the couch "past the coffee table." He dropped to one knee and testified that he felt "sick to my stomach." He dialed 911 without ever touching the victim. During the 911 call, he was asked to see whether the victim was still breathing. Again, he did not touch her (App. 173-75). Next, Waldman stepped over her body, without touching her, and he ran down the hallway to check on the victim's baby. After making sure the baby was fine, he knocked on Shaw's apartment door but did not get anyone to answer. He also knocked on a downstairs apartment door without anyone responding. He then waited on law enforcement to arrive, and he gave a written statement to them. He subsequently provided voluntary blood, hair, and fingerprint samples to the Greenville County Sheriff's Office (App. 175-78).

        Eric Burts testified that he dealt crack to the victim before her death. He had known her for about one or one-and-a-half years. He saw her three times on May 22, 1998. He first went to her apartment around 6:00 or 6:30 p.m. after she paged him "for some crack." He was accompanied by a Marcus Martin on this occasion. He used the phone, then he left her apartment and went to "Augusta Hills" where he "hangs out." Burts returned to her apartment later and sold her more crack. A woman he knew as "Shirley Jean" was present at the apartment. He and a friend drove Shirley Jean and her boyfriend to work before returning to Augusta Hills (App. 182-85). Burts went back to the victim's apartment around midnight and sold her more crack. Michael Richardson and Benny Irby went with him. This time he entered and left through the back door to her apartment. In addition to one of her children, the petitioner was present. Burts had known the petitioner for 15 years or longer. Burts did not have any further contact with either the victim or the petitioner that night. He further testified that it was possible that the petitioner was aware he was bringing drugs to the victim on his final visit (App. 185-87).

        Deputy Jeff Maxwell of the Greenville County Sheriff's Office was the first member of law enforcement to arrive on May 23, 1998. Theodore Waldman was inside the

9

victim's apartment and near the door when he got there.  Waldman was still talking to the dispatcher.  State's Exhibit 8, a photograph of the scene, accurately depicted what Deputy Maxwell saw that day.  "The couch had a good amount of what appeared to be blood on it.  The victim had blood on her face and there was blood on the floor."  As he was securing the scene with tape, the petitioner walked out of the apartment across the breezeway from the scene.  He was wearing a plaid shirt and khaki pants and he was carrying a fishing pole (App. 34-39; 41-42).  The petitioner did not immediately say anything, so Deputy Maxwell asked him who he was and where he lived.  The petitioner said his name was Orlando Smith, and he indicated he lived in an apartment in the complex other than the one he had just exited.  When asked why he had come out of the apartment across from the victim, he said that his girlfriend, Lavonda Shaw, lived in that apartment (App. 39).  Deputy Maxwell then spoke to Shaw, who said that the petitioner was her boyfriend.  According to Deputy Maxwell, EMS personnel found the victim's baby (App. 39-40).

On May 23, 1998, Deputy Ray Allen was a forensic technician with the Greenville County Department of Community Services.  He and another technician responded to the victim's apartment on May 23rd and processed it (App. 44-45).  He testified as follows:

> Upon arrival we went up to the apartment. The door was already open. Entering the apartment there was a sofa on the other side, it was kind of front living room area. We could see what looked to be suspected blood on the couch, there was pillow that had blood on the couch. There was blood on the carpet directly in front of the couch. Just down to the right of the couch was a coffee table and to the right of the couch was an end table. The victim was lying face up, she was not clothed from the waist down. She had a bra on. Her shirt was pulled up above the bra. Her hands were kind of up over her head. She had what appeared to trauma to her head and neck area and had suspected blood about her head and face.
>
> Also looking at her arm on the initial entry to the scene, I observed some patterns on her arm as her arm was above, kind of laying on her head, that were to me almost indicated like separations of fingers, there was four, to be distinct patterns

10

> were there was suspected blood, then a space with no blood, and there are four about finger width apart. Maybe think that maybe she had been touched in that area and we decided that we would process her later to see if we could get any suspected prints off her.

(App. 45-46).  Deputy Allen testified that photographs taken by him accurately depicted the crime scene – including he position of the victim's body – and the area outside the scene (App. 47-50).

Deputy Allen collected clothing items and a swabbing of suspected blood on the coffee table next to the body, and he processed the entire apartment for latent prints. He also photographed the suspected print on the victim's left bicep at autopsy.  He also recovered three individual hairs from the body, as well as fingernail clippings (App. 50-55). In May 1998, Paul Wilkerson was employed as a latent print examiner in the Forensic Division in Greenville County.   The latent lifts taken from the victim's apartment were compared to the known prints of the victim, Eric Burts, Theodore Waldman, and the petitioner.   One print was identified as that of the victim.   There were a number of unidentified prints, and four prints from a white plastic bag found on the kitchen floor were made by Waldman.  Wilkerson explained that it was not unusual to find prints from persons known to have been in a room or home (App. 60-64).

The most significant evidentiary item in this case was the suspected print on the victim's left bicep.  After examining both a photograph of this item (State's Ex. 33) and the enlargement of that picture (State's Ex. 34), Wilkerson was "reasonably certain" that this print had been made by the petitioner's left palm; however, he testified that it was very difficult to see as photographed, and he lacked the necessary equipment to enhance it and make a positive identification.  He therefore forwarded the photographs to latent examiner Ron Smith, who had the necessary equipment to make identifications and is "one of the fairly renowned examiners when it comes to palm prints" (App. 64-68).   Smith, the Associate Director of the Mississippi Crime Laboratory in Meridian, Mississippi, positively

11

identified the print on the back of the victim's left bicep as the petitioner's left palm print. He opined that it was impossible for the print to have been made while the victim's body was in the position where it was found. It was also determined that the blood was on the hand when the victim was touched on her bicep (App. 69-78, 80-81).

On May 23, 1998, Gene Donohue was employed as an investigator in the Greenville County Sheriff's Office's Violent Crime Scene Unit. There were a number of members of law enforcement present when he arrived on the scene on May 23rd, and the coroner was also present. After being briefed, he viewed the scene. He spoke to Theodore Waldman while at the victim's apartment, and he later took a statement from Waldman at the Greenville County Law Enforcement Center. Donohue also spoke to both Shaw and the petitioner that day. The petitioner gave Donohue a pair of beige pants, which he retrieved from his mother's apartment (App. 89-96). Later that day, the petitioner gave Donohue the following statement at the Law Enforcement Center:

> I have a 12th grade education. I can read and write. Last night at about 9:30 or 10 I went to Chris' apartment ... . When I got there a white guy was there who I had seen around before. I went inside and conversated for awhile while the guy rolled a joint. Me and the white guy smoked a joint and I left. I went across the street in front of the "B" Buildings with some people from the neighborhood. We was all standing around chilling. I had been outside about 15 or 20 minutes when I seen the white guy drove by in a black camero. I stayed outside for while longer and went in about 2 or 3 in the morning. I went to my girl Lavonda's house ... and went to bed. I got up this morning to go fishing and seen all the police cars outside. End of statement.

(App. 101).

Donohue testified that on May 28th it was learned that the petitioner's left palm print was the bloody print found on the victim's left arm, and he was arrested for murder that day. He then waived his *Miranda* rights and gave another statement (App. 102-08). In this statement, he claimed:

> I lied the other night about what happened before I came home. It was about 4 in the morning and I was going home to my

> girlfriend's apartment. I stopped because Chris' apartment door was opened. I went in and I seen her laying on the floor with her pants down. I seen blood on her and the floor. I was trying to see what she all right. I nudged her and tried to see did she have a pulse. I checked for her pulse on her neck and her forearm but couldn't find none. Then I realized she was dead. After that I left, went to my girlfriend's house, sat down for a minute, then I fell asleep. I didn't call the police because I was scared and didn't want to be involved.

(App. 101).

Because Donohue had been advised that the cause of death was "strangulation with some type of ligature," he went back to the victim's apartment. On the back porch, he found a ligature with a small stick. He retrieved another ligature from a nearby dumpster. He also obtained a belt that Eric Burts had borrowed and worn on May 23rd (App. 110-13). Using photographs taken of the victim's neck during the external examination at autopsy, Donohue explained that a number of gouge marks on the victim's neck appeared to have been caused by her efforts to get the ligature used to strangle her off of her neck. He also demonstrated that most of the force appeared to be right side of her neck (App. 113-15).

Dr. Larry Minnette, a forensic pathologist, testified that the victim's cause of death was from ligature strangulation. He likewise opined that the gouge marks found on the victim's neck were caused by her efforts to remove the object that was used to strangle her. A gash on the victim's chin would have bled, as would another laceration above the left ear on her head. Below the skin, on the right side of the victim's neck, Dr. Minnette found hemorrhage above the strap muscle. He further opined that the ligature was wrapped tightly around the victim's neck more than once (although he could not say it was wrapped twice) and that "the ligature mark was more continuous on the right side and back." The victim's blood alcohol level was 0.13% and there was "cocaine and breakdown products of cocaine in her blood and urine" (App. 136-42).

13

The petitioner's girlfriend, Lavonda Shaw, testified that the petitioner was living with her on May 22, 1998. He was casually dressed in a pair of khakis and a blue and red shirt when he left her residence between 6:00 and 7:00 p.m. that evening. "He was dressed to go out," and his pants were clean and pressed. He came back between 9:00 and 10:00 that night and got a cigarette from Shaw and a beer from the refrigerator. He was still dressed in the same clothing (App. 203-06). The petitioner returned to Shaw's residence between 2:30 and 3:00 a.m. on May 23rd and showered, which Shaw testified that he would not normally do. The next morning, both Shaw and the petitioner saw the police cars at the apartment complex, but the petitioner did not tell her that he knew anything about the victim's death. Also, he had a fishing pole with him when he left the apartment, and Shaw was unaware of any previous plan he had to go fishing. Shaw later spoke with Gene Donohue and permitted him to search her apartment for the clothes the petitioner had been wearing on May 23rd. She discovered the pants in her son's bedroom, where the petitioner had discarded them. He admitted that the pants had bloodstains on them. The petitioner also wrote Shaw a letter and asked her to lie about when he came back on the morning of May 23rd (App. 206-18). He also told Shaw that if the police asked her about any clothing items or what he was wearing on the night of the killing she should say that she did not remember (App. 114).

At the conclusion of the State's case, trial counsel moved for a directed verdict. He argued that the State had not proved its case, there was no evidence of motive or even animosity between the victim and the petitioner, and there also was no murder weapon. He contended the only evidence connecting the petitioner to the offense was the palm print and the opportunity to kill her (App. 219-20). After listening to the State's reply, the trial judge denied the motion for a directed verdict (App. 220-22). At the close of all evidence, counsel's renewed motion for a directed verdict was denied (App. 270-74). The jury found the petitioner guilty of murder.

14

## STATE PCR PROCEEDINGS

In the State PCR proceedings, the petitioner testified that he had given his trial counsel the names of several witnesses:  Bennie Irby, Shirley Jean Robinson, Carolyn Bell, Eric Burts, and other witnesses.   He also told counsel these witnesses would be of assistance to his defense, and he asked counsel to subpoena them for trial.   Trial counsel subpoenaed a "couple of them."

The petitioner added that a number of witnesses were under subpoena but did not show for trial, including Shirley Jean Robinson.  Counsel told the trial judge they were not present.  The petitioner asserted that Robinson "was a crucial witness ... because she told several people in my neighborhood that she also found the dead body that I found" at the apartment.  She also told this to some of the petitioner's family members.  Robinson had also seen Burts physically abuse the victim (App. 349-51; 360).

On the Sunday before the petitioner's trial, counsel brought the subpoena for Robinson to the petitioner and said that he did not know where Robinson lived.  The petitioner stated that Robinson lived in the building next to him, and he gave the subpoena to his (the petitioner's) girlfriend, who served Robinson.  However, "she said she wouldn't be coming because she didn't want to get involved.  And she never showed up" (App. 351; 369).

The petitioner further testified that he told counsel that Carolyn Bell "was going to be one of the suspects – part of their defense."  The petitioner grew up with Eric Burts and described him as "one of the prime suspects."  The petitioner saw Burts at the victim's apartment three or four times on the night of the killing and stated that Burts was selling drugs to the victim.  He allegedly "was missing" for two hours after midnight, and Bell was his alibi because he claimed, at trial, that he was having sex with her.  Bell never testified. The petitioner stated that, to his knowledge, no one ever spoke with her (App. 351-52; 359-60).

15

The petitioner further testified that it was his understanding that Bennie Irby had given a belt to Burts on the evening the victim was murdered. The State had supposedly waved the belt during closing argument. There was no testimony presented at trial that Irby gave the belt introduced by the State to Burts. Trial counsel did not find or speak to Irby. However, the petitioner had seen statements by Irby that had been taken by a private investigator hired by his PCR counsel (App. 358-59). On cross-examination, the petitioner admitted that his trial counsel had cross-examined Burts at trial (App. 369-70).

Carolyn Bell testified at the PCR hearing that she knew Eric Burts. She was "sure" Burts unexpectedly showed up at her residence sometime close to when the homicide occurred in May 1998, but she did not remember the date. She used to date him but was not dating him at that time. She did recall that he showed up at her residence "one night unexpectedly." However, he only stayed there "15 or 20 minutes," and they did not have sex. That was the last time that she saw him. She was not contacted by trial counsel, but she admitted that she was staying with her grandmother beginning in November 1999 and had moved to another address at the time of the petitioner's trial (App. 375-80).

The petitioner's trial counsel testified that he received discovery from the State in the petitioner's case. He made a copy of the discovery and sent it to the petitioner. He also reviewed the discovery with his client. Although the information was not exculpatory, he remembered two things that had been disclosed. First, there was a statement by the petitioner's girlfriend, Lavonda Shaw, that the petitioner hid some bloody pants underneath her son's bed on the night of the killing. Also, he received a copy of a letter the petitioner had written to Shaw in which he asked "her to lie about the time he got home." When shown the letter, the petitioner admitted that he had written it to her from jail (App. 381-83).

The trial counsel also testified that he had Carolyn Bell's name from Eric Burts' statement. He added that "in cases like [this one], is people usually are friends or are known to the Defendant. I'll ask them to get them all together if they can." In the present

16

case, he went to either the petitioner's apartment or the apartment of his sister or mother, and counsel "interviewed them and gave them subpoenas. ... I would either serve them or ... in this case, his girlfriend served them."  He could not find Bell, and Robinson did not show even though subpoenaed.  Counsel's recollection was that Robinson could have testified that "[s]he went in, too, and didn't call the police."  However, she would not have negated that the petitioner also went inside "and handled the body."  He did not think she was a crucial witness, whereas he wished that he could have found Bell (App. 384-85).

Trial counsel testified that Robinson could have also testified to incidents of physical abuse of the victim by Burts, and this "may have helped point some more fingers at the drug dealer," which was consistent with his theory of the case.  "But she was very reluctant.  She said she wasn't coming and she wasn't going to say anything when she got on the witness stand. ... I didn't know if she was going to help me or not" (App. 385).  Several of the other witnesses appeared at trial and testified (App. 386; *see also* App. 251-69).

With respect to Bennie Irby's statement about the belt, trial counsel testified that he did not recall the belt being introduced into evidence.  He also thought that the prosecutor's statement that the State did not have a motive for the crime helped the defense, as did the admission that there was no murder weapon (App. 386-87).  On cross-examination about Irby's statement to police that the victim owed Burts money for crack, trial counsel indicated that he had argued in closing argument that this was why Burts had killed the victim.  He also did not recall being provided with evidence in discovery that the victim had called her grandmother earlier on the evening of her death and said her wallet had been  stolen from the apartment.  However, he did not think that evidence the victim, who worked at Burger King, owed money to Burts for crack was critical (App. 390-91).  With respect to his failure to interview and present Irby as a witness, counsel admitted that he had not spoken to Irby to determine whether the belt that Burts provided to law enforcement

17

was the same belt Irby had loaned to Burts. However, counsel's recollection was that the belt was not consistent with the ligature marks found on the victim's neck, which were narrower (App. 391-92).

## APPLICABLE LAW

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The Fourth Circuit Court of Appeals has stated as follows regarding the standard of review in cases, like the instant case, that are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

For a claim that was adjudicated on the merits in state court proceedings, this Court will not issue a writ of habeas corpus under the AEDPA unless (a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of

18

> legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." *Green v. French*, 143 F.3d 865, 870 (4th Cir.1998). "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.* When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review of questions of law and mixed questions of law and fact is de novo. *See Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir.1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court).

*Weeks v. Angelone*, 176 F.3d 249, 257-58 (4th Cir. 1999).

## ANALYSIS

In ground five, the petitioner alleges that trial counsel was ineffective in failing to obtain a crime scene expert and forensic testing relating to evidence collected at the scene (blood, hair, and palm print).  The petitioner further contends that counsel failed to present evidence that the belt presented to the jury at trial was not the same belt that Bennie Irby gave to Burts and that Burts was wearing on the night of the murder (petition at 12-15).   He also claims in this ground that trial counsel was ineffective for failing to develop evidence of battered woman syndrome, based upon the victim's relationship with prosecution witness Eric Burts, who had sold crack to the victim on the night of her death.

Judge Harwell noted in his order:

> While these issues may not have been specifically addressed in the PCR Order, the PCR Order does mention the failure to hire an investigator and contains a reference to "failure to test the hair samples or to challenge the palm print." (PCR Order, p. 5). The transcript of the PCR hearing reflects that the record was left open for sixty (60) days by the PCR judge. It appears several affidavits may have been filed by PCR counsel and his investigators on the 60th day with the Greenville County Clerk of Court. The Rule 59(e) motion dealt only with the videotape. The petition for certiorari also appears to mention the issues of

> a crime scene investigation, hair samples, and the palm print
> and references an affidavit by Danny McDaniel, a private
> investigator hired by PCR counsel.

(3/31/08 Order at 4).  Judge Harwell granted the petitioner's motion to add the McDaniel

affidavit and other affidavits to the record of this case.  Judge Harwell further instructed this

court to consider whether these materials were part of the state court record (*id.*).  Judge

Harwell then recommitted the case back to this court for consideration of whether all of the

ground five issues were procedurally defaulted and, if they were not, then whether the

*Strickland* two-part test can be met (*id.*).


### Post-PCR Hearing Affidavits

Judge Harwell directed this court to consider whether certain affidavits were

part of the state court record on PCR.  At the outset of the PCR hearing on October 22,

2003, the petitioner's attorney moved for a continuance.  The basis for the motion was that

PCR counsel had filed a motion to compel certain evidence, including palm print

comparisons and a belt that had not been produced during discovery.  The PCR judge

denied the continuance motion but indicated that he would leave the record open so that

the petitioner could examine these items of evidence.  The petitioner's counsel noted that

some of the evidence "may involve testimony by a witness" (App. 347).  He inquired as to

whether he would be "allowed, after the analysis of [the evidence] to come back before the

court and put the testimony on the record."  The PCR judge responded, "Yes. We'll see ...

how essential it is and what we can work out.  Let's cross that bridge when we come to it."

He then agreed to leave the record open for additional evidence (App. 344-47).  At the

conclusion of the hearing, the PCR judge left the record open for 60 days, so that the

petitioner's collateral attorney could examine these items of evidence.  The PCR judge later

filed a written order indicating the record would be held open for 60 days so the State could

file a memorandum and the petitioner could submit scientific evidence.  The order was

entered on October 28, 2003 (resp. supp. m.s.j., ex. 1).  On October 24, 2003, the PCR judge signed an Order to Compel Production of Evidence for Scientific Testing directing the State Law Enforcement Division ("SLED") and the Greenville County Sheriff's Office to produce and make available all physical evidence and samples collected in this matter for independent scientific testing by the petitioner.  The judge further ordered that any and all comparison samples collected from the petitioner be produced for comparison purposes together with all inventory sheets, transmittal documents, work sheets and reports of such tests and requested tests that were cancelled or withdrawn (resp. supp. m.s.j., ex. 2).

In a memorandum in support of PCR dated December 16, 2003, the petitioner's PCR counsel outlined arguments in the context of the scientific evidence and reports that were not available to the petitioner at the time of the PCR hearing.  Counsel noted that he and his private investigators reviewed certain evidence, as ordered by the PCR court, on November 24 and December 3, 2003 (App. 417-32).  Attached to the memorandum and referenced as an exhibit in the memorandum was the affidavit of private investigator Danny McDaniel, who interviewed Benny Irby in prison (App. 433-34).  McDaniel testified that Irby told him that the belt Burts borrowed from him on the day of the murder was long, thin, and black.  Upon reviewing the belt in evidence at the Greenville County Sheriff's Office, McDaniel took photographs of that belt to Irby, who stated that he thought the belt was his, but it was not the same belt he had given Burts on the day of the murder.  Included as an exhibit to the McDaniel affidavit was a letter from Irby, who again stated that the belt in evidence was not the belt he loaned to Burts (App. 435).  The petitioner argued that had trial counsel pursued this issue with an expert, the jury could have concluded that the belt that was given to Burts by Irby was not turned in to the Sheriff's Office because it was used in the commission of the homicide and was subsequently discarded (App. 424).

21

PCR counsel also referenced an Exhibit B to the memorandum, which was an affidavit by M. Bruce Jernigan,[3] a retired criminology instructor and crime scene analyst. The memorandum states that Jernigan examined the belt, the ligature, and the long hair-like strand. He found evidence of blood only on the ligature (App. 425). PCR counsel argued that the trial counsel should have had an independent analysis and comparison of the palm prints done, noting that nowhere in the record is there testimony showing that there was an identification as to the number of points of reference given by the experts (App. 427). PCR counsel further noted that three hair samples were found on the victim's body. However, no tests were run on the hair samples because it was SLED policy not to test hair samples if there was blood evidence, as in this case (App. 430). Trial counsel, however, did not ask for an independent analysis or ask the court to compel a hair sample be taken from the other suspect, Burts.

On December 23, 2003, the affidavits of the petitioner's PCR counsel,[4] Jernigan, and McDaniel (with the attached letter from Irby) were filed with the Greenville County Clerk of Court (resp. supp. m.s.j., ex. 4). By order of March 31, 2004, Judge Miller denied and dismissed the application for PCR. In the order, Judge Miller stated that he had before him a copy of the transcript of the proceedings against the petitioner, the records fo the Greenville County Clerk of Court, and petitioner's records from the South Carolina Department of Corrections (App. 437). As noted by the respondent, only McDaniel's affidavit is contained in the Appendix to the *Johnson* Petition for Writ of Certiorari (App. 433-34). Based upon the foregoing, it is clear that the the McDaniel affidavit was part of the

---

[3]Jernigan's affidavit was not included in the Appendix to the *Johnson* Petition for Writ of Certiorari. Judge Harwell has previously granted the petitioner's motion to make the McDaniel, Jernigan, and O'Leary affidavits a part of the record in the instant case. As will be discussed below, this court is of the opinion that the affidavits were part of the state court record in PCR.

[4]Petitioner's PCR counsel, John O'Leary, testified in his affidavit regarding his review of the video of the crime scene. According to his testimony, the video showed blood on the outside back porch of the victim's apartment. He also testified that the video showed the ligature that was found on the back porch. This affidavit, like Jernigan's affidavit, was not included in the Appendix.

state court record considered by the PCR judge.  Furthermore, it appears likely to this court that the affidavits of PCR counsel and Jernigan were also part of the state court record before the PCR judge as the judge left the record open for 60 days for scientific evidence to be produced by the petitioner, the affidavits pertained to such scientific evidence, the affidavits were filed with the Greenville County Clerk of Court,[5] and the affidavits were referenced in counsel's memorandum in support of PCR.


***Procedural Bar***

The petitioner's claim that his trial counsel was ineffective for failing to develop evidence of battered woman syndrome, based upon the victim's relationship with prosecution witness Eric Burts, is clearly procedurally barred.  The petitioner did not raise this issue in his State PCR, the PCR judge did not address such an allegation, the petitioner did not raise the issue in his Rule 59(e) motion or in the petition for writ of certiorari, and the appellate court could not and did not address the claim.  *See Pruitt v. State*, 423 S.E.2d 127, 128 (S.C. 1992) (issue must be raised to and ruled on by the PCR judge in order to be preserved for review); *Plyler v. State*, 424 S.E.2d 477, 478 (S.C. 1992) (same).

If a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts.  In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage

_____

[5]The respondent argues that the affidavits were not timely filed. However, while the judge stated at the conclusion of the PCR hearing on October 22, 2003, that the record would be held open for 60 days, the written order to that effect was not filed until October 28, 2003 (resp. supp. m.s.j., ex. 1). Accordingly, the affidavits were arguably timely filed on December 23, 2003. Furthermore, the affidavits were referenced by PCR counsel in the memorandum in support of PCR dated December 16, 2003. While only McDaniel's affidavit was attached to the copy of the memorandum that is included in the Appendix (App. 433-35), it appears that this may have been an oversight in the compilation of the Appendix.

23

of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). A petitioner may establish a fundamental miscarriage of justice by showing that a constitutional error probably resulted in the conviction of one who is actually innocent. In order to raise a claim of actual innocence, a prisoner "must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). The petitioner has made no such showing. Accordingly, this issue is procedurally barred from review.

The respondent argues that the remaining allegations in ground five, with the exception of the allegations regarding trial counsel's ineffectiveness in failing to employ an expert to test the hair samples or to challenge the palm print, are also procedurally barred. However, for purposes of this motion, this court will assume without deciding that the remaining allegations in ground five are not procedurally barred and will consider the claims on the merits.

### *Merits*

Claims of ineffective assistance of counsel are governed by the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687. To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that the deficient performance actually prejudiced him, *i.e.* "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Finally, the Court in *Strickland* held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the

24

defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.  Review of counsel's performance is "highly deferential." *Id.* at 689.  "[I]n claims brought under § 2254, 'it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.' . . . Rather, . . . § 2254(d)(1) requires a habeas petitioner to show that the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *James v. Harrison*, 389 F.3d 450, 456 (4th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

In the order of dismissal, the PCR judge did not "find the Applicant's or his witness' testimony to be credible on the issues in this case.  Trial counsel's testimony is found credible.  This Court finds that the Applicant has failed to show that his trial counsel rendered ineffective assistance" (App. 410).  The PCR judge further found:  "The failure to test hair samples or to challenge the palm print do not create a valid claim of ineffective assistance of counsel either.  No evidence was presented to this Court that would show that either action would have had a reasonable probability of changing the result of the proceeding" (App. 440-41).

The petitioner cannot show prejudice with regard to his trial counsel's failure to test hair samples or to challenge the palm print.  The petitioner failed to present in the PCR proceedings any expert testimony from either a fingerprint expert or an expert in hair analysis.  *See Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir.1990) (holding petitioner's allegation that attorney was ineffective due to lack of investigation does not support relief absent proffer of the supposed witness's favorable testimony).  South Carolina also follows this rule. *See Dempsey v. State*, 610 S.E.2d 812, 814 (S.C. 2005) ("A PCR applicant cannot show that he was prejudiced by counsel's failure to call a favorable witness to testify at trial if that witness does not later testify at the PCR hearing or otherwise

25

offer testimony within the rules of evidence."); *Bannister v. State*, 509 S.E.2d 807, 809 (S.C. 1999) ("The applicant's mere speculation what the witnesses' testimony would have been cannot, by itself, satisfy the applicant's burden of showing prejudice") (citing *Glover v. State*, 458 S.E.2d 538, 540 (S.C. 1995)).

Further, as argued by the respondent, the palm print evidence presented at trial tended to establish overwhelming evidence of guilt. As discussed above, Paul Wilkerson, a latent print examiner in the Forensic Division in Greenville County, examined the suspected print on the victim's left bicep. After examining both a photograph of this item and the enlargement of that picture, Wilkerson was "reasonably certain" that this print had been made by the petitioner's left palm; however, he testified that it was very difficult to see as photographed, and he lacked the necessary equipment to enhance it and make a positive identification. He therefore forwarded the photographs to latent examiner Ron Smith, who had the necessary equipment to make identifications and is "one of the fairly renowned examiners when it comes to palm prints" (App. 64-68). Smith, the Associate Director of the Mississippi Crime Laboratory in Meridian, Mississippi, positively identified the print on the back of the victim's left bicep as the petitioner's left palm print. He opined that it was impossible for the print to have been made while the victim's body was in the position where it was found. It was also determined that the blood was on the hand when the victim was touched on her bicep (App. 69-78, 80-81). This evidence was not refuted by expert testimony in the PCR hearing and has yet to be satisfactorily explained by the petitioner. Furthermore, the petitioner gave two inconsistent stories to law enforcement. In the first, he denied any knowledge of the killing. In the second, he admitted finding the victim and touching her. However, the evidence is clear that it was impossible for the petitioner to have left his bloody palm print in the manner he described to the officers. Other evidence of the petitioner's guilt included the bloody pants he hid at his girlfriend's home on the night of the killing and the letter he wrote to his girlfriend in which he asked her "to lie about the

time he got home" on the night of the killing and to tell the police she did not remember what clothes he had on that night (App. 114).  Based upon the foregoing, the state court's decision was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent.  Further, the decision was based on a reasonable determination of the facts in light of the evidence presented in the State court proceeding.  Accordingly, the claim fails.

The petitioner further argues that trial counsel was ineffective for failing to employ an expert to test certain items for the presence of blood.  As argued by the respondent, even considering the post-PCR hearing affidavits, the petitioner has failed to demonstrate a *reasonable probability* that the result of the proceeding would have been different, "but for counsel's unprofessional errors."  *Strickland*, 466 U.S. at 694.

The affidavit from private investigator M. Bruce Jernigan, which is dated December 22, 2003 (or one week after it was served on counsel for the State),  states that he and private investigator Danny W. McDaniel went to the Greenville County Solicitor's Office and the Greenville County Sheriff's Office in "early December 2003."  They met with staff and examined evidence in the case (Jernigan aff. ¶ 4).  Specifically, he examined and tested (1) a man's brown, size 40 vinyl belt; (2) a length of cord, which was roughly 31" long and tied around a small stick ; and (3) "[a] length of platted manmade fiber" that was brown or dark burgundy and "platted in a fashion that human hair would be platted" (Jernigan aff. ¶ 6).  He viewed all three items under a "hand held magnifier" for the presence of stains and found nothing on items (1) and (3).  However, he noted a "a small dark substance" that was "on the end of the cord near the stick on item (2) (Jernigan aff. ¶ 7).  He thereafter performed presumptive tests for the presence of blood on the stain (a "Hemo-Stick," a Phenolphthalein test and an O-Tolidine test), all of which indicated the possible presence of blood.  Based upon his testing, he opined that item (2) "bore traces of blood" (Jernigan aff. ¶¶ 7-8).

27

The December 22, 2003, affidavit of PCR counsel states that a review of a videotape of the crime scene showed blood on the cement steps of the victim's back porch. He claims this was exculpatory because Burts was the only person seen in that area at or around the time of the offense (O'Leary aff, ¶ 5).

The petitioner cannot show prejudice based upon this evidence for several reasons. Initially, there is no positive indication that what Jernigan found was actually human blood or, if human blood, whose blood was present. His expert performed only presumptive testing on the stain, and he did not perform either blood typing or DNA testing to determine whether the blood matched Burts, the petitioner, or someone else. Likewise, no testing was performed on the substance found on the victim's porch in order to determine whether, in fact, this substance even presumptively tested positive for blood. Thus, all the petitioner actually presented was speculation and conjecture.

Moreover, and assuming that blood was present on the cord or the victim's back porch, this still does not show prejudice under *Strickland*. It was not disputed that the crime scene was bloody. Deputy Jeff Maxwell of the Greenville County Sheriff's Office was the first member of law enforcement to arrive on May 23, 1998. He testified that State's Ex. 8, a photograph of the scene, accurately depicted what he saw that day. "The couch had a good amount of what appeared to be blood on it. The victim had blood on her face and there was blood on the floor" (App. 34-39, 41-42). Deputy Ray Allen, who was a forensic technician with the Greenville County Department of Community Services at the time of the homicide, saw the suspected bloody palm print on the victim's body (App. 45-46), and he testified that photographs taken by him accurately depicted the crime scene – including the position of the victim's body – and the area outside the scene (State's Ex. 2-5, 9 and 11; App. 47-50). He likewise collected clothing items and a swabbing of suspected blood on the coffee table next to the body, and he photographed the suspected print on the victim's left bicep at autopsy (State's Ex. 33-34, App. 47-55). Further, the petitioner did not dispute

28

6:07-cv-00327-RBH    Date Filed 08/12/08    Entry Number 34    Page 29 of 30

that he had made the bloody palm print (App. 230). At best, it appears that this evidence would only corroborate Mr. Donohue's opinion that the ligature was used to strangle the victim, without providing light on the perpetrator's identity.

The petitioner also contends that his trial counsel was ineffective for failing to present evidence that the belt presented at trial was not the same belt that Bennie Irby gave to Burts and that Burts was wearing on the night of the murder. Judge Harwell has previously determined that the petitioner is not entitled to relief based upon trial counsel's failure to subpoena Irby at trial (ground two). At the PCR hearing, trial counsel testified that he did not recall the belt being introduced into evidence. He also thought that the prosecutor's statement that the State did not have a motive for the crime helped the defense, as did the admission that there was no murder weapon (App. 386-87). Trial counsel further testified that he had not spoken to Irby to determine whether the belt that Burts provided to law enforcement was the same belt Irby had loaned to Burts. However, counsel's recollection was that the belt was not consistent with the ligature marks found on the victim's neck, which were narrower (App. 391-92).

As discussed above, the petitioner submitted a post-PCR affidavit by private investigator Danny McDaniel as an exhibit to his memorandum in support of PCR. McDaniel stated in his affidavit that he interviewed Benny Irby in prison (App. 433-34). McDaniel testified that Irby told him that the belt Burts borrowed from him on the day of the murder was long, thin, and black. Upon reviewing the belt in evidence at the Sheriff's Office, McDaniel took photographs of that belt to Irby, who stated that he thought the belt was his, but it was not the same belt he had given Burts on the day of the murder. PCR counsel also attached to his memorandum a letter from Irby, who again stated that the belt in evidence was not the belt he loaned to Burts (App. 435).

The respondent argues that Irby's statement is hearsay and that it is "telling" that the petitioner's PCR counsel failed to obtain a sworn statement from Irby. Further, the

29

respondent argues that the petitioner's failure to present Irby at the PCR hearing bars his argument of prejudice.  *See Bannister v. State*, 509 S.E.2d 807, 809 (S.C. 1998) ("This Court has repeatedly held a PCR applicant must produce the testimony of a favorable witness or otherwise offer the testimony in accordance with the rules of evidence at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial."); *see also Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir.1990) (holding petitioner's allegation that attorney was ineffective due to lack of investigation does not support relief absent proffer of the supposed witness's favorable testimony).  Moreover, the respondent argues that, at best, Irby's testimony would have impeached Burts only on a collateral matter and would not implicate him in the homicide in any manner.  This court agrees.  The petitioner has failed to show prejudice caused by trial counsel's failure to present evidence that the belt presented at trial was not the same belt that Bennie Irby gave to Burts and that Burts was wearing on the night of the murder.  Based upon the foregoing, this claim fails.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment be granted with prejudice as to ground five.

s/William M. Catoe
United States Magistrate Judge

August 12, 2008

Greenville, South Carolina

30